Filed 9/24/13  P. v. Owens CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069838 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02610) |
| v. | |
| KENNETH OLIVER OWENS, JR., | |
| Defendant and Appellant. | |
| THE PEOPLE, | C069853 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02610) |
| v. | |
| MAURICE EDWARD REED, JR., | |
| Defendant and Appellant. | |
| THE PEOPLE, | C069856 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02610) |
| v. | |
| DEJON WAYNE MURRAY, | |
| Defendant and Appellant. | |

1

Three separate juries respectively convicted the three defendants here—Kenneth Oliver Owens, Jr., Maurice Edward Reed, Jr., and Dejon Wayne Murray—of first degree felony murder with special circumstances (committed in the course of a robbery and a burglary; defendants were also convicted of two counts of robbery in concert and one count of burglary). (Pen. Code, §§ 187, subd. (a), 189, 190.2, subd. (a)(17), 211, 213, subd. (a)(1)(A), 459, 462, subd. (a).)[1] The juries also found that Murray and Reed personally used firearms in these offenses while Owens was vicariously armed. (§§ 12022.53, subd. (b), 12022, subd. (a)(1).)

Sentenced to state prison for life without parole (LWOP) plus lengthy determinate terms, defendants separately appeal.[2]

Murray, who was two months shy of 18 years old when he committed the offenses, disputes the evidentiary sufficiency of the special circumstance findings; claims the trial court failed to instruct the jury properly (most significantly, on lesser offenses, on distinguishing special circumstance first degree felony murder from simple first degree felony murder, and on various mental impairments); and raises several issues regarding sentencing juveniles to LWOP.

Reed, who maintained he was not the shooter in this home invasion robbery gone awry, claims the evidence did not show he acted with reckless indifference to life, as required to sustain the special circumstance findings; contends his counsel was ineffective in simply arguing he was not the killer in this felony-murder case; and asserts certain jail booking fees were not supported.

---

[1] Undesignated statutory references are to the Penal Code.

[2] We consolidated these three separate appeals for purposes of oral argument and disposition.

Owens claims the trial court erred in responding to a jury question about the evidentiary status of telephone records referenced by a police officer in interviewing Owens, and erred in receiving certain hearsay evidence implicating him. Owens joins in the arguments of his codefendants to the extent they benefit him.

We shall reverse the judgment of sentence as to defendant Murray, and remand for the trial court to exercise its sentencing discretion in light of the United States Supreme Court's intervening decision in *Miller v. Alabama* (2012) 557 U.S. ___ [183 L.Ed.2d 407] (*Miller*). Otherwise, we shall affirm the judgments.

## FACTUAL BACKGROUND

### *Victims of Robbery and Burglary*

Roommates Derek Martin and Eric Warren were having dinner at their apartment on Friday, March 26, 2010, when there was a knock at their door. Warren thought it was their friend, Salvador Heredia-Arriaga (the eventual murder victim here), who was going to take Warren out to a bar. Instead, two armed men intruded.

The first man was Reed, who, about one week before, had come to the apartment to buy marijuana from Warren; Warren had a marijuana recommendation and occasionally sold marijuana. Reed carried a revolver. The second man was Murray, carrying a semiautomatic handgun.[3] About two days before, Murray had accompanied Owens to the apartment; Owens, who had previously lived at the same apartment complex, came to buy marijuana, which he had done on several previous occasions while also socializing with Warren.

---

[3] Because there is little dispute on appeal about the identity of the two intruders, they are referred to herein as Reed and Murray.

Reed and Murray barked orders and threats to kill at Martin and Warren, gathered up marijuana, cash, wallets, and video games and equipment, herded Martin and Warren to the bathroom, and then demanded four minutes for an escape.

While in the bathroom, Warren heard the front door open. Realizing it was Heredia-Arriaga, Warren yelled, "Sal, give it up. We are being robbed." Warren and Martin heard scuffling, and then one gunshot. Emerging from the bathroom, Warren and Martin discovered a fallen Heredia-Arriaga, who died of a gunshot wound to the chest.

### Witness Desirea Cunningham

Desirea Cunningham, defendant Owens's girlfriend and the mother of their child, told police that she heard Owens call his cousin, Reed, on the night of the homicide. Owens told Reed that he had a "lick" (a robbery), mentioning that a person, who apparently lived at Owens's former apartment complex, had money, a plasma TV, and an Xbox. Owens told Reed to meet him "somewhere" near the apartments.

At trial, Cunningham acknowledged these statements, but said they were lies prompted by Cunningham's anger over "another woman."

### Accomplice/Accessory Tamika Reed

Tamika Reed (Tamika) is defendant Reed's sister, defendant Owens's cousin, and the girlfriend of a good friend of defendant Murray's. She was charged with special circumstance murder but received a plea bargain of three years eight months, for accessory and grand theft, in exchange for testifying against these three.

On the night of the shooting, Tamika was at a party for her boyfriend, which defendants Reed and Murray also attended, when Reed asked Tamika to drive him to get some marijuana. As the two Reeds were heading out, defendant Reed had Tamika pick up Murray, who had just obtained from another man something wrapped in a white shirt.

Tamika and her crew subsequently engaged with defendant Owens and followed his car to an apartment complex. There, they all parked. Owens told defendants Reed

4

and Murray to knock on a certain door and provide some sort of word or code. Owens stayed behind, talking to Tamika, and then walked off.

A short time later, Owens returned, walking rapidly to his car and driving off hurriedly. Defendant Reed followed hastily in short order, jumping in Tamika's car and saying, "Go, go, go." On the way out, they stopped for Murray, who flopped in the backseat armed with a gun in one hand and a PlayStation in the other.

Tamika's trio drove to her apartment, where Owens joined them about five or 10 minutes later. At Tamika's apartment, Reed gave a "cowboy" (revolver) gun to Murray, which was unlike the gun Tamika had seen Murray with during their getaway. The three defendants argued and lamented why Murray had shot the man, with Murray responding, "He was wrestling with you [(i.e., Reed)]. What was I supposed to do . . . ?" Then, they divided the loot.

### Physical Evidence

Found at the scene of the shooting were an ejected (fired) .40-caliber semiautomatic bullet casing, a fired bullet embedded in a wall, and an unfired .40-caliber bullet.

A criminalist opined that a fingerprint taken from a videogame case at the scene matched Murray's.

When Murray was arrested about four weeks after the shooting, he was carrying a loaded .44-caliber revolver (which would not eject bullet casings like the .40-caliber semiautomatic casing found at the scene). Incriminating text messages were found on Murray's cell phone.

### Defendant Reed's Admissions

In a jail interview with a local television reporter, Reed stated that he went to the Martin-Warren apartment to rob the men, not to kill them; he also wrote a letter of apology to the Heredia-Arriaga family.

*Defense Evidence*

Defendant Murray presented two witnesses.

A clinical psychologist tested Murray's IQ at 69 (mildly retarded), and opined that Murray's overall intellectual functioning was closer to 75 (borderline range; functioning at a very basic level).

Channa Gates (Murray's aunt), testified Tamika told her that defendants Reed and Owens got Murray "all liquored up and all drugged up" and took him to the robbery; that Murray was not the shooter; and that Owens had set up the robbery.

## DISCUSSION

### I. Defendant Murray's Appeal

### A. *Substantial Evidence Supports the Special Circumstance Finding*

Murray argues that, absent some eyewitness, rather than just *ear*witness, description of the shooting, the evidence is insufficient to show that the actual shooting was committed to carry out or advance the independent felony of robbery or burglary, as required to sustain special circumstance first degree felony murder based on robbery or burglary. We disagree.

To determine the sufficiency of the evidence to support a criminal conviction, including a special circumstance finding, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128; *People v. Mayfield* (1997) 14 Cal.4th 668, 790-791.)

The robbery-murder (analogously, the burglary-murder) special circumstance applies to a murder committed in the course of a robbery, not to a robbery committed in the course of a murder. (§ 190.2, subd. (a)(17); *People v. Marshall* (1997) 15 Cal.4th 1, 41.)

6

This argument from Murray, the first one he makes, is apparently an attempt to swing for the fences in this appeal; however, the argument is not even a Texas League single.

Essentially all the evidence recounted above showed that robbery was at the center of this criminal undertaking. The murder victim, unfortunately, was in the wrong place at the wrong time; he unexpectedly intruded upon the scene while the robbery victims were sequestered in the bathroom and defendants were effectuating their escape from the robbery. The jury had more than ample evidence to find that defendants murdered Heredia-Arriaga to carry out or advance their robbery of Martin and Warren; if anything, the evidence was insufficient to find that defendants had only murder on their mind, and the robbery was an incidental afterthought.

## B. The Trial Court Did Not Err in Declining to Instruct on any Lesser Included Offenses to First Degree Felony Murder, Robbery and Burglary

During trial, Murray requested instruction on lesser included offenses of second degree murder and involuntary manslaughter. After confirming that the People had dropped the premeditated (malice-based) murder charge—the information charged defendants with malice murder (§ 187)—and were proceeding solely on a theory of first degree felony murder based on robbery and burglary (§ 189), the trial court determined that "the lessers to the murder one [were] not appropriate."

The trial court subsequently instructed the jury on first degree felony murder, first and second degree robbery, and first and second degree burglary (the first degree robbery and burglary required an inhabited dwelling as the scene of the crime). The jury was also instructed to consider voluntary intoxication, involuntary intoxication, and any mental impairment as to Murray in determining whether he acted with the required intent or mental state for these crimes.

7

" 'When the evidence points [u]ndisputedly to a homicide committed in the course of a felony listed in section 189 of the Penal Code [(which includes the felonies, robbery and burglary)], the court is justified in [instructing] the jury that the defendant is either innocent or guilty of first degree [felony] murder,' " that is, is justified in instructing only on first degree felony murder. (*People v. Anderson* (2006) 141 Cal.App.4th 430, 448 (*Anderson*), quoting and adding italics to *People v. Turner* (1984) 37 Cal.3d 302, 327, which was overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115.)

Again, as shown in the Factual Background of this opinion and reiterated in part I.A. of the Discussion, *ante*, the evidence here pointed *undisputedly* to a homicide committed in the course of a robbery or a burglary. Consequently, the trial court was justified in declining to instruct on second degree murder and involuntary manslaughter, after confirming that the People were proceeding solely on a theory of first degree felony murder.[4]

Murray disagrees for several reasons.

First, Murray claims he "deserved *some* instructional and verdict form support for all [his] arguments [that he] was [merely] a drunken friend along for the ride who hung around outside the apartment." Murray may have argued this theory, but sufficient evidence to instruct upon it was not presented. (See *People v. Breverman* (1998) 19 Cal.4th 142, 162 [to instruct upon a theory, evidence must be substantial enough to

---

[4] The People note that the California Supreme Court has expressly left open the question whether second degree murder is a lesser included offense (requiring instruction) when the prosecution proceeds solely on a theory of first degree felony murder (*People v. Taylor* (2010) 48 Cal.4th 574, 623); but the People suggest the high court, more recently, has cast doubt on such an inclusion by pointing out that malice is an element of second degree murder but not of first degree felony murder (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328-1329).

merit a jury's consideration].) Aside from the evidence recounted in the Factual Background of this opinion, Murray's statement to the police was presented to his separate jury. That statement was one of denial; Murray recalled being drunk at the party Tamika mentioned, but he did not go along on a ride to any other apartments. Defense testimony from Murray's aunt setting forth statements Tamika made to her, did not support this theory, either; according to Murray's aunt, Tamika said defendants Reed and Owens got Murray all liquored and drugged up and took him to a robbery, and Murray was not the shooter.

Second, Murray contends that the giving of so many related mitigation instructions—voluntary intoxication, involuntary intoxication, mental impairment, after-formed intent to steal, and even aiding and abetting—but not lesser offense instructions, which were also supported on the same grounds, is incongruous. These mitigation instructions largely concerned the required mental states for the burglary, the robbery, and the first degree felony murder (including the underlying felonies of burglary or robbery, and independent intent to commit the burglary or the robbery), and were properly given. These mitigation instructions, if found applicable, could wipe out the required mental states for these offenses, but could not create lesser offenses in their stead here.

Third, Murray asserts that the incredulous attempts by Tamika (and her brother, defendant Reed) to shift blame to Murray bespeaks the need for full instruction on a range of lesser offenses. Again, though, substantial evidence was not presented that a drunken Murray was simply taken along for the ride, and hung around outside the crime scene. Furthermore, the jury did not need to rely on the Reeds' attempts to pin Murray as the actual killer to convict Murray of first degree felony-murder special circumstance on the instructions properly given here regarding nonkiller participants.

9

Fourth, Murray relies on *Anderson* as entitling him to a second degree murder instruction. Unlike here, however, the evidence in *Anderson* did not "[u]ndisputedly" indicate a first degree felony murder or innocence. In *Anderson*, substantial evidence supported a finding that the defendant there, a nonkiller participant, formed an intent to take the victim's money only *after* the fatal act by the codefendant—i.e., in *Anderson*, there was substantial evidence of a robbery committed in the course of a murder, rather than a murder committed in the course of a robbery. (*Anderson*, *supra*, 141 Cal.App.4th at p. 448.)

Fifth, and finally, and again relying on *Anderson*, Murray argues in a related, catchall fashion that "the *complete* omission of any homicide or relevant robbery/burglary lessers whatsoever posed a real, prejudicial, and unfair all-or-nothing pressure not to let [Murray] off *scot-free* on an unlawful killing where he was present despite clouded facts that demanded full instruction." Murray points to the *Anderson* court's reversal; there, the trial presented an unfair choice of felony murder or nothing because of substantial evidence of an after-formed intent to steal, which would negate felony murder. Again, for the reasons previously given, we reject this argument. *Anderson*'*s* facts are not the facts before us.

We conclude the trial court did not err by declining to instruct on lesser included offenses of murder, robbery, and burglary.

### C. *The Trial Court Properly Instructed on Special Circumstance Felony-murder*

Murray argues that the CALCRIM instruction given here on special circumstance felony-murder (CALCRIM No. 730), in contrast to a clearer CALJIC instruction on the subject (CALJIC No. 8.81.17), inadequately conveyed the special circumstance requirement that the felony could not be merely incidental to the commission of the murder. We disagree.

10

As set forth in Murray's briefing, CALJIC No. 8.81.17 states, as pertinent: "The murder was committed in order to carry out or advance the commission of the [felony] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance . . . is not established if the [felony] was merely incidental to the commission of the murder."

As given here, CALCRIM No. 730 stated, as relevant: "[I]n order for a special circumstance to be true, the People must prove that a defendant intended to commit robbery or burglary independent of the killing. If you find that a defendant only intended to commit murder, and the commission of robbery or burglary was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved . . . ."

Murray argues that the first sentence of CALCRIM No. 730 is inadequate because jurors need to know that even if there is an independent intent to commit the robbery or the burglary (an intent necessary for any felony murder), in the special circumstance felony-murder context "the overall felony [must not merely be] incidental to [the] killing." Murray claims the second sentence of CALCRIM No. 730 does not convey this special circumstance requirement of a nonincidental felony either, because its conjunctive phrasing ("and") "effectively eliminates the nonincidental rule as a separate requirement."

A defendant who claims an instruction is subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way the defendant claims. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) We do not find a reasonable likelihood here.

Special circumstance felony-murder requires that the felony not be merely incidental to the commission of the murder; that is, the murder must be committed in the course of committing the felony, rather than the felony being committed in the course of

11

committing the murder. (See §190.2, subd. (a)(17); *People v. Marshall*, *supra*, 15 Cal.4th at p. 41.) Special circumstance felony-murder reflects a legislative belief that it is appropriate to make those who kill to advance an independent felonious purpose eligible for special circumstances; this goal is not achieved when the felony is merely incidental to the murder. (§190.2, subd. (a)(17); *People v. Horning* (2004) 34 Cal.4th 871, 907.)

CALCRIM No. 730, as given here, adequately conveyed this nonincidental requirement for the felony. Murray, in concluding otherwise, reads the instruction's first sentence in isolation, and its second sentence with mental gymnastics. This reading does not meet the legal standard of a "reasonable likelihood" of juror misunderstanding. In fact, *Horning* concluded that the second sentence of CALJIC No. 8.81.17, *on its own* (see quote above), adequately conveyed the nonincidental requirement. (*Horning*, *supra*, 34 Cal.4th at pp. 907-908.) CALCRIM No. 730, as given here, was at least the equivalent of the second sentence of CALJIC No. 8.81.17.

Murray notes, however, that the prosecutor further confused matters by arguing that "the elements of the special circumstance were '[e]xactly what I've already discussed [regarding felony murder].' " In this argument, though, the prosecutor was referring to the threshold matters of the commission of the robbery or the burglary for felony murder and for special circumstance felony-murder, and not to the special circumstance requirement of a nonincidental felony.

We conclude the trial court properly instructed with CALCRIM No. 730 as given here.

### D. The Trial Court Did Not Err Prejudicially in Giving a Partial Instruction on Natural and Probable Consequences Liability

There are two kinds of aider and abettor liability, one of which involves natural and probable consequences.

12

First, an aider and abettor is liable for a criminal offense that he knowingly and intentionally helped commit. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The trial court properly gave standard instructions on this type of aider and abettor liability.

Second, under the natural and probable consequences doctrine, an aider and abettor is liable for any other offense that was a natural and probable consequence of the crime aided and abetted. (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1117.) In giving a standard instruction defining an aider and abettor, the trial court, erroneously, included the following optional language on the natural and probable consequences doctrine, which was inapplicable here: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

Under this erroneous instruction, Murray argues, jurors were told an aider and abettor could be found guilty of other crimes "[u]nder some . . . circumstances," but those circumstances were "completely undefined"; this allowed the jury unguided discretion to decide if he was guilty of some other crime committed on the same occasion "beyond whatever crime(s) he intended." Murray notes that jurors apparently doubted whether he was the shooter, by finding that he personally used (rather than personally discharged) a firearm; this, says Murray, confirms a real risk that some or all jurors found he was liable for murder under the natural and probable consequences doctrine.

We disagree. The natural and probable consequences doctrine was never presented or argued at trial. This erroneous instructional fragment pales in comparison to the detailed instructions and requisite findings the jury was provided to find Murray was a murderer here. As Murray recognizes, the "specific circumstances" in the erroneous instruction were left "completely undefined." Thus, the jury had no context of circumstances in which to apply this instruction.

13

Generally, giving an irrelevant or inapplicable instruction is only a technical error, which does not require reversal. (*People v. Cross*, *supra*, 45 Cal.4th at p. 67.) That describes the situation here.

### E. The Trial Court Properly Instructed Regarding Voluntary Intoxication and Mental Impairment

Murray contends that in stark contrast to the instruction on involuntary intoxication, which *mandated* that the jury consider evidence of involuntary intoxication on required mental states, the instructions on voluntary intoxication and mental impairment allowed the jury *discretion* to consider such evidence. We disagree.

As relevant, the three instructions provided as follows.

As to involuntary intoxication: "Consider any evidence that a defendant was involuntarily intoxicated in deciding whether that defendant had the required intent or mental state when he acted."

As to voluntary intoxication: "[Y]ou may consider evidence, if any, of a defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether that defendant acted with the specific intent or mental state required for that crime or allegation."

And, as to mental impairment: "You have heard evidence that defendant [Murray] may have suffered from a mental impairment. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, [d]efendant Murray acted with the intent or mental state required for that crime or allegation."

These three instructions do not present any improper *mandatory* versus *discretionary* dichotomy argued by Murray. (See *People v. Stevenson* (1978) 79 Cal.App.3d 976, 987 [on retrial there, the jurors were to be instructed that they must consider evidence of intoxication rather than that they should].) As the People correctly recognize, the instructions on voluntary intoxication and mental impairment do not

14

suggest the jury was free to ignore that evidence; these two instructions merely told the jury that such evidence could be considered only for a limited purpose—in fact, the same purpose for which the evidence of involuntary intoxication could be considered.

### F.  The Trial Court Properly Instructed Regarding the Corroboration Requirement for the Accomplice Testimony of Tamika; if Not, the Error Was Harmless

Murray contends the trial court erroneously instructed the jury that if the crime of robbery or burglary was committed, then Tamika was an accomplice as a matter of law to that crime and her testimony should be viewed with caution and could not be used by itself to convict defendants.  Murray claims Tamika's accomplice status should have been left as a question of fact for the jury; making her an accomplice as a matter of law all but told the jury that Tamika was an accomplice in this assertedly tandem robbery/burglary, unfairly imputing guilt to Murray and decimating his defense argument that he was merely a drunken dupe along for the ride too and did not go inside the Martin-Warren apartment (as Tamika also claimed).

As the People point out, however, nothing in the challenged accomplice instructions suggested that Tamika was an accomplice *of Murray* or that *Murray* participated in any crimes.  Tamika, who was serving a prison sentence for her involvement in the crimes charged, was an accomplice to the crimes independent of any involvement of Murray.  Furthermore, as noted previously, little evidence supported Murray's *argument* that he was merely a drunken friend along for the ride who did not go inside the Martin-Warren apartment.

Even if we assume the trial court erred in deeming Tamika an accomplice as a matter of law, we would not reverse.  It is not reasonably probable that Murray would have fared better had Tamika's accomplice status been left to the jury as a question of fact—making her an accomplice as a matter of law ensured that her testimony against Murray would be viewed skeptically.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 [setting forth this standard of reversible error].)  Furthermore, analogizing Murray to

15

Tamika could have helped Murray because Tamika was convicted only of being an accessory to the charged crimes.

### G. Special Circumstance Felony-murder Is Constitutionally Specific

Murray claims that the offense of special circumstance felony-murder unconstitutionally fails to narrow, in any rational way, the class of persons subject to LWOP or the death penalty, when contrasted with simple felony murder which carries a sentence of 25 years to life.

Murray recognizes that the state Supreme Court has consistently rejected the claim that special circumstance felony-murder does not adequately narrow the class of persons subject to the death penalty. (See, e.g., *People v. Pollock* (2004) 32 Cal.4th 1153, 1195.) He points out, however, that the state high court has not considered this issue in the context of LWOP. All we can say to that is, even more so, the special circumstance felony-murder is constitutional in the LWOP context.

But Murray argues that "[a]t least capital defendants receive added rational narrowing in penalty phases. LWOP defendants do not. Without any added penalty factors, or even a penalty trial, imposition of a drastic term of LWOP, versus 25 years to life for felony murder, based on the same conduct, is arbitrary and unconstitutional . . . ."

This argument goes off the rails in concluding that simple felony murder and special circumstance felony-murder are "based on the same conduct." The most pertinent distinction between the two, and a distinction properly instructed upon here, is this: With the simple variety, a perpetrator simply kills while committing the qualifying felony; in the special circumstance context, a perpetrator kills to carry out or advance the felony. It is this more purposeful killing that constitutionally narrows the class of persons subject to LWOP or the death penalty for special circumstance felony-murder. (See *People v. Pollock*, *supra*, 32 Cal.4th at p. 1195.)

16

***H. In Light of the United States Supreme Court's Postsentencing Decision in* Miller,**
***Remand Is Required for the Trial Court to Exercise Its Discretion in***
***Sentencing Murray to LWOP or to a Term of 25 Years to Life***
***for the Special Circumstance Felony-murder***

Murray contends that the federal Constitution's Eighth Amendment ban on cruel and unusual punishment requires a remand for resentencing on his special circumstance felony-murder sentence of LWOP, in light of the United States Supreme Court's decision in *Miller*, *supra*, 557 U.S. ___ [183 L.Ed.2d 407].  *Miller* was decided about eight months after the sentencing hearing here.  We agree that we must remand for the trial court to exercise its sentencing discretion on this offense in light of *Miller*'s principles. (The trial court sentenced Murray to LWOP on the special circumstance felony-murder; plus an unstayed sentence of 31 years four months, for the two robberies and firearm findings.)

Section 190.5, subdivision (b) (hereafter, section 190.5(b)) states, with respect to 16- and 17-year-old juveniles tried as adults and convicted of first degree special-circumstance murder, like Murray here:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

Based on the text, structure and history of this statute, California appellate court decisions have interpreted section 190.5(b) as setting forth LWOP as "the *generally mandatory* . . . [and] *presumptive* punishment for 16- or 17-year-old special-circumstance murderers, and the [sentencing] court's discretion [as] concomitantly circumscribed to that extent."  (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1142, italics added; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1088-1089 [accord].)

Subsequent to these California decisions and to the sentencing hearing in this matter, the United States Supreme Court, in late June 2012, decided *Miller*, *supra*,

17

567 U.S. ___ [183 L.Ed.2d 407]. *Miller* held that a *mandatory* LWOP sentence for any juvenile offender (i.e., under the age of 18 at the time of the offense) violates the federal Constitution's Eighth Amendment ban on "cruel and unusual punishments." (567 U.S. at pp. ___ [183 L.Ed.2d at pp. 414-415, 424].)

*Miller* based its decision on two strands of high court precedent concerned with the concept of proportionate punishment, a concept central to the Eighth Amendment. Such a mandatory LWOP scheme, said *Miller*, (1) prevents the sentencing authority, be it "judge or jury," from considering a juvenile's " 'lessened culpability' " and "greater 'capacity for change' " (relative to adults), and (2) does not meet the requirement of "individualized sentencing" for defendants facing the most serious penalties. (*Miller*, *supra*, 567 U.S. at pp. ___ [183 L.Ed.2d at pp. 414, 415, 417-418, 421-422], citing in part *Graham v. Florida* (2010) 560 U.S. ___ [176 L.Ed.2d 825] and *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1].)

LWOP is the harshest possible penalty constitutionally available for juveniles, in light of *Roper*'s holding that the Eighth Amendment categorically bans the death penalty for juvenile offenders, and *Graham's* holding that the Eighth Amendment categorically bans LWOP for a juvenile convicted of a nonhomicide offense. (See *Miller*, *supra*, 567 U.S. at pp.___ [183 L.Ed.2d at pp. 417-418, 430].) The *Miller* court characterized its decision as requiring only that a "sentencer" ("judge or jury") "follow a certain process" before imposing this harshest possible penalty on a juvenile offender: i.e., consider the offender's youth and the hallmark features of youth (among them, immaturity, impetuosity, and failure to appreciate risks and consequences); and consider, in an individualized way, the nature of the offender and the offense (for example, as relevant, the offender's background and upbringing, mental and emotional development, and possibility of rehabilitation). (*Miller*, at pp. ___ [183 L.Ed.2d at pp. 426, 422-423, 421-422]; see also *id*. at pp. ___ [183 L.Ed.2d at pp. 414-415, 417-418, 430].)

18

*Miller* further remarked that "given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations to *Roper* and *Graham*.] Although we do not foreclose a sentencer's ability to make that judgment [i.e., LWOP] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 424].)

Recently, our state high court, in *People v. Caballero* (2012) 55 Cal.4th 262, pointedly quoted for our purposes the following language from *Miller*, " '[N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile [i.e., *Miller* extended *Graham*'s reasoning (but not its categorical LWOP-ban) to homicide cases].' " (*Caballero*, *supra*, at p. 267, quoting *Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 420].)

Here, the trial court judge did not have the benefit of *Miller*'s constitutional guidance in sentencing under section 190.5(b). Instead, the judge was obligated to follow the LWOP-presumptive punishment interpretation of that statute from the appellate court decisions in *Guinn* and *Ybarra*. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

19

The constitutional protections recognized in *Miller* apply to Murray on appeal because his case is not yet final.  (*Griffith v. Kentucky* (1987) 479 U.S. 314, 322, 328 [93 L.Ed.2d 649, 658, 661].)  A sentencing remand, then, is necessary so the trial court can exercise its discretion to impose a sentence of LWOP or a sentence of 25 years to life on Murray's conviction for special circumstance felony-murder—in light of *Miller*, without having to consider LWOP as the "generally mandatory" or "presumptive" choice.

As one would expect from this legal posture of *Miller*'s unavailability to the trial court, the sentencing record shows that the "certain process" mandated in *Miller* for juvenile LWOP sentencing was not fully applied here.

The trial court, in part, covered the nature of the offense and the offender.

As for the nature of the offense, the court found Murray to be the shooter, though the jury did not do so (the jury found Murray personally used, rather than personally discharged, a firearm; the trial court noted the jury did not have the benefit of the statements of the other participants in this incident).

As for Murray's background and upbringing (i.e., the nature of the offender), the court noted the absence of a father in Murray's life; and noted that Murray, at age 14, had assaulted another student at school and assaulted the vice-principal who broke up that fight; had been involved in numerous fights with jail inmates while incarcerated during the pending proceeding; and was "not salvageable."  But the trial court failed to note the absence, for much of Murray's life, of a mother as well (due apparently to psychiatric hospitalizations), and that Murray spent much of his childhood in foster care.  Nor did the trial court say much, if anything, about Murray's mental and emotional development, including his borderline intellectual capacity and impaired judgment, his susceptibility to influence from the other two defendants here (who were adults), and his apparent intoxication at the time of the crimes.

20

And the trial court did not consider Murray's youth and the hallmark features of youth (among them, immaturity, impetuosity, and failure to appreciate risks and consequences). The court remarked that Murray was a juvenile "technically," observing more than once that Murray was just two months shy of 18 at the time of the offenses.

Consequently, we shall reverse the judgment of sentence as to Murray and remand for resentencing, in light of *Miller*, on his conviction for special circumstance felony-murder.[5]

## I. Cumulative Error

Lastly, Murray contends the cumulative effect of the alleged errors discussed above render his conviction unfair. Given that discussion, we disagree.

## II. Defendant Reed's Appeal

### A. Substantial Evidence Supports a Special Circumstance Finding that Reed Acted with Reckless Indifference to Human Life

To find special circumstance first degree felony murder and impose the ultimate punishment of LWOP or death in line with the federal Constitution's Eighth Amendment ban on cruel and unusual punishment, a defendant must have been the actual killer; or, if the defendant was not the actual killer, the defendant must have intended to kill, or must have been a major participant in the felony and acted with reckless indifference to human life. (§ 190.2, subds. (c), (d); *People v. Estrada* (1995) 11 Cal.4th 568, 572; see *Tison v. Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 145].)

---

[5] Murray claims the probation report for sentencing, to which he did not object, was "unreliable." An unobjected-to probation report is generally a proper source of information upon which judicial sentencing discretion may be exercised. (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 725.)

Furthermore, given our sentencing remand, it is unnecessary at this point to consider Murray's contentions that an LWOP sentence is unconstitutionally cruel and unusual under the federal and state Constitutions.

Proceeding from the assumption that he was not the shooter, defendant Reed contends the evidence was insufficient to show he acted with reckless indifference to human life in the robbery and burglary. We disagree.

As noted, to determine the sufficiency of evidence to support a criminal conviction, including a special circumstance finding, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kipp*, *supra*, 26 Cal.4th at p. 1128; *People v. Mayfield*, *supra*, 14 Cal.4th at pp. 790-791.)

As the jury was properly instructed, the term "reckless indifference to human life" means that the defendant "knowingly engage[d] in [the underlying felony] that he kn[ew] involve[d] a grave risk of death." (See *People v. Estrada*, *supra*, 11 Cal.4th at p. 577.)

The evidence showed that Reed recruited the younger, possibly intoxicated, teenager Murray to help in an armed home invasion robbery of a marijuana seller, and Reed asked Murray to provide the weaponry. Murray provided two handguns (Reed claimed the gun Murray gave him was not loaded). During the robbery, Reed initially pointed his gun at Warren, and Murray initially pointed his at Martin, and Reed told Murray that if "they [Warren and Martin] do anything, shoot them." Reed, who was in command, repeatedly told Murray that if the robbery victims moved (from where they had been ordered to sit), Murray should shoot and kill them. It could have come as no surprise that Murray would use his weapon as Reed had commanded when the murder victim supposedly scuffled with Murray.

Though these facts arguably are not as egregious as those of the nonkillers in *Tison*, they are sufficient for a rational jury to have found beyond a reasonable doubt that Reed acted with a reckless indifference to human life.

22

### B. Trial Counsel Was Not Ineffective

Reed contends his trial counsel rendered ineffective assistance by arguing to the jury, in closing argument, that Reed was guilty of the robbery and the burglary, but not the murder. Reed argues that his trial counsel's sole reliance, in a felony-murder case, on the legally invalid defense that Reed was "not a killer" required the jury to ignore the law as instructed, and conceded that Reed was guilty of first degree felony murder. This, says Reed, constituted a "complete denial of counsel" for which prejudice must be presumed under *United States v. Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 668].

To establish ineffective assistance of counsel, a defendant must show (1) his counsel performed unreasonably, and (2) there is a reasonable probability the result would have been more favorable absent such performance (i.e., a probability sufficient to undermine confidence in the outcome). (*In re Avena* (1996) 12 Cal.4th 694, 721.)

On the record on appeal, we find Reed's counsel performed as a reasonable attorney. Consequently, Reed cannot establish his trial counsel was ineffective.

Prior to trial, Reed admitted the robbery to the police, to a local television reporter in a jail interview, and to the decedent's family, but denied being the shooter.

Reed's admission of robbery, given Heredia-Arriaga's killing, left trial counsel little room to maneuver. It was reasonable for trial counsel to make the best of a bad situation, by conceding the issue of first degree felony murder (sentence of 25 years to life) and trying to convince the jury that Reed was not guilty of the special circumstances (sentence of LWOP), because Reed, as the nonshooter, did not act with reckless indifference to life.

Reed asserts his counsel did not explicitly argue the reckless indifference issue, and should have tendered a defense based on the prosecution's failure to meet the heavy burden of proof beyond a reasonable doubt. These points were implicit in counsel's

23

argument, and explicit in the instructions provided the jury. Furthermore, for these reasons, there was not the complete denial of counsel as envisioned in *Cronic*.

### C. Reed Has Forfeited His Claim Regarding Fees; in any Event, any Error Was Harmless

Reed contends there is insufficient evidence to support the trial court's implied finding that he had the ability to pay a main jail booking fee of $270.17 and a main jail classification fee of $51.34, imposed pursuant to Government Code section 29550.2.

Reed has forfeited these contentions because he failed to raise them at sentencing. (*People v. McCullough* (2013) 56 Cal.4th 589, 591, 597; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357.)

In any event, any error in this regard was harmless here. The challenged fees total $321.51, payable through the court's installment process. Reed has been sentenced to LWOP, plus a determinate term of 31 years four months. He is a young man. Thus, there is sufficient evidence that he will be able to pay off this amount through prison work wages.

### III. Defendant Owens's Appeal

### A. The Trial Court Did Not Err in Responding to Jury Question

Defendant Owens contends the trial court erroneously responded to a jury question, during deliberations, regarding phone records that a detective showed Owens while interviewing him. We disagree.

While interviewing Owens on April 28, 2010, Detective Ashley Englefield apparently showed Owens his cell phone records and told him the records showed: (1) that Owens and Tamika had called one another several times the day of the murder (Owens responded to this information, "Oh shit. I—I don't know. I guess, you feel me?"); and (2) that Owens had gone to Tamika's after the murder given the location of the cell phone towers his phone was using (Owens had denied this journey).

24

A tape of this interview was played and transcribed for the jury, and the parties had stipulated that the tape was an "accurate" copy of the interview.

During its deliberations, the jury asked the trial judge the following question: "On the videos that Owens reviewed a list of phone calls, the lawyers stipulated that the videos are fact. We want to confirm that the phone records are in evidence based on the stipulation and are con[s]idered fact?"

The trial judge responded, "No physical telephone records were introduced into evidence in this case. Documents were shown to Mr. Owens in the video purporting to be telephone records. As to the authenticity of the records, it is up to you to determine whether or not the documents were in fact telephone records, and what if any relevance they have. [¶] The stipulation was that the video accurately reflected the events that took place in the interview room; it is up to you to determine what if any relevance those events have in this case."

Owens argues that the jury should not have been told that it should determine if the phone records, which were not placed into evidence, were authentic. Owens maintains the trial judge should have responded along the following lines: "The jury is not to consider the documents seen in the video as evidence of telephone records but only as documents displayed during the interrogation. Whether or not the documents were in fact telephone records has not been established. Representations by the officer as to their content should not be considered as being true or not being true."

Owens's suggested response is more legally accurate than the one the trial judge gave here. But we think the trial judge's response, in light of other instructions the judge gave, properly instructed the jury on this point.

The first thing the trial judge told the jury in responding to the jury's inquiry was: "No physical telephone records were introduced into evidence in this case." This went to

25

the heart of the jury's question and dispelled the jurors from thinking these records were in evidence and were "con[s]idered fact" based on the lawyers' stipulation. Furthermore, the jury had also been instructed that it must "decide what the facts are" and "what happened, based only on the evidence that has been presented to [it] in this trial"; and that it "must use only the evidence that was presented in this courtroom."

The portion of the trial judge's response about the "authenticity" of the records was framed in a layperson, rather than a legal, context. The trial judge had previously admonished the jury regarding Tamika's taped interview with the police: "One thing I want to let you know, though, about these tapes. What's important is the statements that the person on the tape is making. Sometimes the detectives will give them information in order to get a response or to get a reaction out of that person. What you hear the detectives say on the tape when they say that so and so told me such and such, you should not consider that for the truth of what the detective is saying because it's hearsay. I'm letting it in because it may give meaning to, in this case, [Tamika's] response, but what the detective is telling her that somebody else said to him, you are not to take for the truth of the matter. Okay?"

Given the trial judge's response, in light of the other relevant instructions he provided, we do not believe the trial court erred on this point. Assuming for the sake of argument the judge did err, that error was harmless given this overall instructional context.

## B. The Trial Court Did Not Abuse Its Discretion in Allowing the Testimony of Defendant Murray's Aunt as a Prior Consistent Statement of Tamika Following Tamika's Impeachment

Tamika testified that her brother (defendant Reed), on the night of the murder, phoned for directions to Owens's residence; that when she, Reed and Murray arrived at that residence, Reed made another call and then told Tamika to follow Owens's car; and

26

that, after arriving at the apparent destination, Owens told Reed and Murray to go to a certain apartment, knock on the door, and then use some type of word or code.

Owens's counsel subsequently tried to impeach Tamika, noting that Tamika had "add[ed] [Owens] into the story," that Tamika would tell the police "whatever they wanted to hear," that Tamika would "do or say anything" if it meant that she could be with her daughter, and that Tamika never knew anything about anyone planning a robbery.

Owens's counsel later expressed concern about Owens's jury hearing purported testimony from defendant Murray's aunt that Tamika had said Owens set up the robbery.

The trial court then noted that Tamika had testified that defendant Reed told her that Owens "had set this up." Owens's counsel agreed with this assessment. The trial court further noted that Owens's cross-examination of Tamika implied that Tamika "recently fabricated" Owens's involvement, and that if Tamika made the "set-up" statement before that, the "set-up" statement was a prior consistent statement admissible to support Tamika's credibility. Based on this reasoning, the trial court admitted this challenged testimony of defendant Murray's aunt.

A trial court's evidentiary rulings are reviewed under the abuse of discretion standard. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1388.)

As relevant here, evidence of a statement previously made by a witness that is consistent with her testimony at the hearing is inadmissible to support her credibility unless it is offered after an express or implied charge that the witness's testimony was recently fabricated, and the statement was made before the motive for fabrication arose. (Evid. Code, § 791, subd. (b).)

The trial court did not abuse its discretion in allowing Owens's jury to hear the testimony of defendant Murray's aunt regarding Tamika's statement to her that Owens

27

set up the robbery. Although Tamika never testified explicitly that Owens had "set up" the robbery, she testified in effect to that, and this is why Owens's counsel had agreed with the trial court's assessment of Tamika's testimony. The testimony of defendant Murray's aunt regarding Tamika's "set up" statement fell within the admissibility criteria of Evidence Code section 791, subdivision (b).

Owens further notes that the prosecution initially brought up Tamika's plea deal, and asserts that the hearsay testimony of defendant Murray's aunt regarding Tamika's "set up" statement falls within the evidentiary prohibition that a party cannot introduce evidence of a collateral fact to impeach a witness, only to then rehabilitate the witness with otherwise inadmissible evidence. (*People v. Lavergne* (1971) 4 Cal.3d 735, 744.) That did not happen here. Tamika's plea deal is not a collateral fact, and the prosecution did not introduce the deal to impeach her (Tamika was a prosecution witness); defendant Murray did.

## DISPOSITION

The judgment of conviction against defendant Murray is affirmed. The judgment of sentence against defendant Murray is reversed, and the matter is remanded for the trial court to exercise its sentencing discretion regarding Murray's conviction for special circumstance felony-murder, in light of *Miller*, *supra*, 557 U.S. ___ [183 L.Ed.2d 407]. The judgments against defendants Reed and Owens are affirmed.


        BUTZ        , J.

We concur:


     BLEASE     , Acting P. J.


     MAURO     , J.